QUALITY OILFIELD PRODUCTS, INC., Appellant,

v.

MICHIGAN MUTUAL INSURANCE COMPANY, Appellee.

No. 14–96–01093–CV.

Court of Appeals of Texas, Houston (14th Dist.).

April 16, 1998.

John F, Schaffer, Houston, for appellant.

William J. Eggleston, Tracy Lynn Jackson, Houston, for appellee.

Before YATES and EDELMAN, JJ., and DRAUGHN,* J.

## OPINION

YATES, Justice.

The dispositive issue in this case is whether a "work slowdown" triggers coverage under a business interruption endorsement of a commercial insurance policy. We find it does not and affirm the judgment of the trial court.

Appellant, Quality Oilfield Products, Inc. (Quality), is a manufacturer of oilfield equipment used for drilling and production. In March, 1992, Quality's workplace was burglarized and engineering drawings, computer media disks, and design information used by Quality to process orders were stolen. Immediately after the burglary, Quality filed a claim for business interruption losses under an insurance policy issued by appellee, Michigan Mutual Insurance Company (Michigan).

* Justice DRAUGHN sitting by assignment.

Quality claimed the items stolen were the nerve center of its operations and caused an interruption of its normal business activity. Michigan denied coverage stating Quality did not suspend operations as required by the policy.

Michigan, subsequently, sought a declaratory judgment that "Michigan has no obligation to compensate its insured, Quality, for losses arising from an alleged 'slow down' in Quality's business due to the theft of certain floppy disks and engineering drawings on or about March 15, 1992." Quality filed a counterclaim for recovery under the policy and bad faith in handling the claim. Quality and Michigan filed competing motions for summary judgment, both contending that the unambiguous language of the policy supported their respective positions on the issue of coverage as a matter of law. The trial court granted summary judgment in favor of Michigan and denied Quality's motion. This appeal followed. In two points of error, Quality contends the trial court erred in granting Michigan's motion for summary judgment and denying its partial motion for summary judgment.

The following standard for reviewing a motion for summary judgment is well-established: 1) the movant must show that no genuine issue of material fact exists and that it is entitled to summary judgment as a matter of law; 2) in deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true; and 3) every reasonable inference must be resolved in the nonmovant's favor. *See Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex.1997) (citing *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985)). When both parties file competing motions for summary judgment and one is granted and the other denied, we will determine all issues presented, including the order denying the losing party's motion. *Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex. 1988). Where, as here, the summary judgment order does not specify the grounds upon which summary judgment was granted, we will affirm the judgment if any of the

theories advanced in the motion is meritorious. *State Farm Fire & Casualty Co. v. S.S.*, 858 S.W.2d 374, 380 (Tex.1993).

■ In its first point of error, Quality contends the trial court erred in granting Michigan's motion because the unambiguous language of the policy invokes coverage. Business interruption coverage under Quality's policy provided for "loss resulting directly from the *necessary interruption of business* caused by damage to or destruction of real or personal property ..." (emphasis added). The provision does not define the term "interruption of business." Consequently, we must determine whether "interruption of business" is an unambiguous term meaning "suspension of operations" as Michigan claims, or includes a "work slowdown" as Quality alleges. Before making such a determination, we note that an intent to exclude coverage must be expressed in clear and unambiguous language. *See National Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex.1991).

■ An insurance contract is ambiguous when it is susceptible to more than one interpretation, each of which is fair and reasonable. *See id.* A determination of whether an ambiguity exists in an insurance policy is a question of law for the court, decided by examining the contract as a whole in light of the circumstances present when the contract was formed. *Coker v. Coker*, 650 S.W.2d 391, 393–94 (Tex.1983). However, courts should not strain to find an ambiguity, if, in doing so, they defeat the probable intentions of the parties, even though the insured may suffer an apparent harsh result as a consequence. *See Glover v. National Ins. Underwriters*, 545 S.W.2d 755, 761 (Tex.1977).

Quality contends "interruption of business" does not mean *total* cessation, shutdown, or stoppage of business and cites to *Lexington Ins. Co. v. Island Recreational Dev. Corp.*, 706 S.W.2d 754 (Tex.App.—Beaumont 1986, writ ref'd n.r.e.). In *Lexington*, the court determined the insured was entitled to business interruption coverage for losses sustained from a storm while its restaurant remained opened for business. *See id.* at 756.

Quality argues the *Lexington* holding supports its proposition that total cessation is unnecessary. We disagree. In *Lexington*, the insured closed its restaurant for several months and the issue before the court was the duration of the business interruption, i.e., whether the insured could recover after the restaurant reopened until the previous level of operation was returned. The court held the terms of the policy were such as to allow recovery for the period the restaurant was rebuilding its business.[1] *See id.* Therefore, business interruption coverage was triggered when the insured suspended its operations and ceased business for a period of time. Because the precise issue of whether "interruption of business" is invoked by a work slowdown is one of first impression in our jurisdiction, we must turn to other jurisdictions and persuasive authority for guidance.

Other courts which have addressed whether similar language in a business interruption insurance clause requires an actual suspension of operations have found that it does. *See, e.g., Ramada Inn Ramogreen, Inc. v. Travelers Indem. Co. of America*, 835 F.2d 812, 814 (11th Cir.1988) (holding an insured could not recover under business interruption clause for decline in occupancy of a hotel which remained open following a fire in the restaurant); *National Children's Expositions Corp. v. Anchor Ins. Co.*, 279 F.2d 428, 431 (2d Cir.1960) (holding no partial business interruption loss because an insured's building was open during entire period when an unprecedented snow storm reduced attendance at an exposition); *Royal Indem. Ins. Co. v. Mikob Properties, Inc.*, 940 F.Supp. 155, 159 (S.D.Tex.1996) (holding under Texas law, business interruption insurance would not cover loss of income from adjacent buildings which were adversely affected by a fire because the insured never suspended operations on the adjacent buildings); *Keetch v. Mutual of Enumclaw Ins. Co.*, 66 Wash.App. 208, 212, 831 P.2d 784, 787 (1992) (holding an insured could not recover under business interruption insurance when volcanic ash caused damage to motel and quality of service was reduced, but motel never ceased operations).

1. The court's opinion does not set forth the terms of the policy.

Quality, however, argues a finding that business interruption coverage is triggered only when an insured *totally* ceases operations would encourage policyholders to unnecessarily shutdown business and not mitigate damages. Quality relies on a Third Circuit opinion that held an insured was entitled to business interruption coverage when a fire destroyed its building, and the insured continued to do business at an alternate site. *See American Medical Imaging v. St. Paul Fire & Marine Ins. Co.*, 949 F.2d 690, 695 (3d Cir.1991). In *American*, the court found the insured would not have any motivation to mitigate losses if the business interruption insurance would not cover such an incident. *See id.* at 692.

*American*, however, is distinguishable from this case. First, the policy language was different in *American* because it provided coverage for "losses from the necessary or *potential* suspension" of the insured's operations. *See id.* (emphasis added). Thus, the policy language was more expansive and covered losses that may potentially suspend an insured's operations. Second, coverage was invoked under the "necessary suspension" language in the policy because the insured totally suspended its operations for a brief period. *Id.* Therefore, *American* does not support Quality's argument that it would not have to completely suspend operations in order to trigger business interruption coverage under its policy.

Michigan contends that a review of the entire policy supports their interpretation of "necessary interruption of business." A mitigation clause in Quality's policy requires the insured to mitigate damages by a "complete or partial resumption of operation of the property." Hence, Michigan argues, an interpretation of the policy which requires something less than a total suspension of business would render the mitigation clause meaningless. In other words, there could be no "resumption" if the insured never stopped doing business.[2] The court in *Keetch* also found support for their holding from a similar mitigation provision. *See Keetch*, 66 Wash.App. at 210, 831 P.2d at 787. "By

requiring the insured to mitigate the loss and resume operations as soon as practicable, the endorsement implies that a business interruption loss has forced the insured to cease business operations." *Id.*

Quality also argues many of the cases Michigan cites are distinguishable because the courts ultimately denied coverage based upon a lack of causation. While this may be true, in reaching their decisions the courts looked to whether the property or buildings covered by the policy were able to remain open despite the loss incurred. Thus, we find this distinction is irrelevant to the central issue presented in this case, that is, whether the insured must actually suspend operations to invoke business interruption coverage.

It is worth noting that the purpose of a business interruption policy is to indemnify the insured for loss caused by the interruption of a going business due to the destruction of the building, plant or parts thereof. *See* 1G Couch, Couch on Insurance § 1:28 (2d ed. 1984). This type of insurance is called use and occupancy insurance and is defined as indemnification for any loss sustained by the insured because of his inability to continue to use the premises or his inability to keep the premises occupied by a tenant. *Id.* at § 1:113. For example, in *Ramada Inn*, the issue was whether a hotel could recover for business interruption insurance when a fire destroyed part of the hotel, and the entire hotel experienced loss of income from a reduction in customers. *See Ramada Inn*, 835 F.2d at 814. The court held recovery for business interruption insurance is intended when the loss is due to an *inability to use the premises* where the damage occurs, and declined to cover income losses incurred from the portion of the hotel that remained open. *See id.* at 814 (emphasis added). Likewise, the United States District Court in Houston found that under Texas law, business interruption insurance would not cover loss of income from adjacent buildings which were adversely affected by a fire. *Royal*, 940 F.Supp. at 159. The court concluded the insured could not recover under

---

**2.** "Resumption" is defined in Webster's Third New International Dictionary as "the act or fact

of taking up again; a second or fresh commencement."

business interruption coverage "[e]ven if the character of the apartment complex was adversely impacted by the fire, [and] there was no "necessary suspension of operations or tenancy...." *See id.* Similarly, Quality is claiming loss of income for a theft which adversely impacted their production, but it remained opened and continued to do business. In fact, Quality continued to operate at a rate of eighty percent of its previous level of capacity immediately after the theft.

In sum, after considering the policy as a whole and persuasive authority from other jurisdictions, we find that "interruption of business" is an unambiguous term meaning "cessation or suspension of business." Therefore, Quality was not entitled to business interruption coverage for the work slowdown it experienced, and we find the trial court did not err in granting Michigan's motion for summary judgment. Quality's first point of error is overruled.

■ In its second point of error, Quality argues the trial court erred in refusing to consider employee affidavits attached to its response to Michigan's motion for summary judgment. Quality contends this evidence would have created a fact issue concerning the intention of the parties and Quality's interpretation of business interruption. Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument. *National Union Fire Ins. Co. v. CBI*, 907 S.W.2d 517, 520 (Tex.1995). Since we have determined the policy language is unambiguous, the trial court did not err in refusing to admit the affidavits in Quality's response. We overrule point of error two.

The judgment of the trial court is affirmed.